657 F.2d 1278
 212 U.S.App.D.C. 36, 8 Fed. R. Evid. Serv. 1573
 UNITED STATES of America
v.
John W. BRUNER, aka Sweetmeat, Appellant.
UNITED STATES of America
v.
Theresa LUCAS, aka Theresa Brooks, Appellant.
UNITED STATES of America
v.
Thomas McCLOUD, aka Mr. Wonderful, Appellant.
UNITED STATES of America
v.
Myrtle M. LYNCH, aka Sister, Appellant.
UNITED STATES of America
v.
Milton BATTLE, Appellant.
UNITED STATES of America
v.
Emma Jean WARD, Appellant.
UNITED STATES of America
v.
Carl L. LYNCH, aka Cobby, Appellant.
UNITED STATES of America
v.
Emma Jean WARD, Appellant.
 Nos. 79-1769 to 79-1772, 79-1774, 79-1784, 79-1785 and 80-1773.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 10, 1980.
Decided June 23, 1981.
As Amended July 29, 1981.
 
 William H. Allen, Washington, D. C. (appointed by this Court) with whom David G. Levere, Washington, D. C., was on the brief for appellant, Carl Lynch in No. 79-1785.
 Steven C. Roat* and Larry J. Ritchie, Washington, D. C. (appointed by this Court) for appellant, E. Ward in Nos. 79-1784 and 80-1773.
 James H. Craddock, Washington, D. C. (appointed by this Court) for appellant, Battle in No. 79-1774.
 Hamilton P. Fox, III, Washington, D. C. (appointed by this Court) for appellant, Bruner in No. 79-1769. Dennis M. O'Keefe, Washington, D. C., was on the brief for appellant, Bruner in No. 79-1769.
 James Mitchell Jones, Washington, D. C. (appointed by this Court) for appellant, McCloud in No. 79-1771.
 Diane Dildine, Washington, D. C. (appointed by this Court) for appellant, Lucas in No. 79-1770.
 Michael S. Frisch, Washington, D. C. (appointed by this Court) for appellant, Myrtle Lynch in No. 79-1772.
 H. Lowell Brown, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry and Charles J. Harkins, Jr., Asst. U. S. Attys., Washington, D. C., were on the brief for appellee. John J. McDermott and Benjamine B. Sendor, Asst. U. S. Attys., Washington, D. C., also entered appearances for appellee.
 Before ROBINSON, Chief Judge, MacKINNON, Circuit Judge, and JUNE L. GREEN,** United States District Judge for the District of Columbia.
 Opinion for the Court filed by Circuit Judge MacKINNON.
 MacKINNON, Circuit Judge:
 
 
 1
 Following a four-month jury trial[1] on an indictment[2] charging unlawful distribution of a controlled substance, interstate travel in aid of a racketeering enterprise, and conspiracy to distribute narcotic drugs, the seven appellants were convicted.[3] Central to the charges was a six-year multi-state drug conspiracy centered in Washington, D. C.
 
 I. THE CONSPIRACY
 
 2
 This case involves the so-called "Fat Lady Conspiracy" which operated under the direction and control of Carl Lynch and a few trusted confederates. They sent groups of overweight women on a regular basis to Philadelphia and New York, and sporadically to Pittsburgh, Atlanta, Miami, and Birmingham. The object of the conspiracy was the acquisition and distribution of Preludin and Dilaudid. Escorted by "team leaders," these groups of women visited doctors in an endeavor to obtain prescriptions for Preludin, a drug prescribed to induce weight loss, and, by complaining of pain, to obtain prescriptions for the pain-reliever Dilaudid. Lynch and his team leaders provided housing for the women and maintained a fleet of automobiles to transport them to the doctors' offices. The team leaders paid for the visits to doctors and, after the women obtained prescriptions for the drugs, transported the women to pharmacies and paid to have the prescriptions filled. Each of the women was paid an amount for each prescription, usually twenty-five dollars. Once the prescriptions were filled, couriers would bring the drugs to Washington, where they were sold from various locations in the Washington metropolitan area by members of the conspiracy.
 
 
 3
 The conspiracy apparently began in Washington, D. C. in 1972. When Preludin became difficult to acquire in Washington, the conspirators began to look to other cities. In both Philadelphia and New York they discovered doctors who were willing to regularly prescribe large quantities of Preludin. In Philadelphia one doctor prescribed significant quantities to the same women several times a day. Another doctor there put one of the members of the conspiracy on his payroll. That doctor prescribed Preludin on the basis of cards on file in his office, without requiring a visit by the "patient." He was paid ten dollars per prescription. One witness testified that she delivered a single payment of $10,000 to this doctor from Carl Lynch. Both of these doctors died during the course of the conspiracy, but others took their places, operating in a similar fashion. One, Dr. Lee Hedson, was ultimately indicted. The Philadelphia network was active up to the time the grand jury returned the indictment. The operation of the conspiracy in New York City followed a similar pattern. Two doctors who participated actively in the conspiracy, Dr. Gus Bashien and Dr. Alfred Calfon, were indicted.
 
 II. APPELLANTS' ARGUMENTS
 A. The Bashien Prescriptions
 
 4
 John Bruner and Carl Lynch make three assertions of error based on the admission into evidence of approximately 5,000 prescriptions and other documents obtained from the offices of Dr. Gus Bashien. First, they argue that the prescriptions were improperly authenticated. Second, they argue that they were denied their Sixth Amendment rights to confront a witness against them. Third, Lynch contends that the prescriptions were inadmissible hearsay.
 
 
 5
 It is the Government's position that the prescriptions were properly admitted. It argues first that the prescriptions were not hearsay and, that even if they were, they were properly admitted under the business records exception. The Government points to the testimony of George Ginsberg, a pharmacist for the State of New York, and Margaret Brophy, a Drug Enforcement Administration investigator, as sufficiently authenticating the documents and as providing the necessary information to support the business records exception. Finally, the Government argues that the documents were properly admitted, although the preparer of documents did not testify, because the reliability and trustworthiness of the documents were otherwise established.
 
 1. Authentication
 
 6
 Testimony of the author is but one way to authenticate documents; circumstantial evidence of authenticity can be sufficient. McCormick on Evidence § 222 (2d ed. 1972). Here, the testimony given by Ginsberg and Brophy adequately authenticated the prescriptions. Ginsberg testified that under New York law, N.Y.Pub. Health Law § 3338 (McKinney), physicians must write prescriptions on state-issued triplicate forms, one copy of which is retained by the doctor on all prescriptions for Schedule II drugs.[4] Transcript (Tr.) at 346-64. He testified that he was responsible for maintaining the state's stock of blank prescription pads and the copies of filled prescriptions sent to the state by pharmacists.[5] Brophy identified the prescriptions offered in evidence as those obtained by her from Dr. Bashien pursuant to subpoena. Finally, Ginsberg testified that the seized prescriptions matched the numbers of the prescriptions which had been issued to Dr. Bashien, with but two exceptions.[6]
 
 
 7
 "(P)roof of private custody, together with other circumstances, is frequently strong circumstantial evidence of authenticity." McCormick on Evidence § 224 (2d ed. 1972). Accord, United States v. King, 472 F.2d 1, 7-8 (9th Cir. 1972), cert. denied, 414 U.S. 1033, 94 S.Ct. 463, 38 L.Ed.2d 325 (1973). The "other circumstances" here include the method by which the State of New York issues and accounts for prescription blanks, as described by Ginsberg. This, when added to Brophy's testimony that the prescriptions were obtained from Dr. Bashien by subpoena, is substantial proof of authenticity, and is "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a).
 
 2. Hearsay
 
 8
 These documents are hearsay only if they contain "statements ... offered in evidence to prove the truth of the matter asserted" and they are not "statement(s) by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(c), (d)(2)(E).
 
 
 9
 The prescriptions are divided into three sections. One section contains the name and address of the physician and the patient and the date the prescription is written. The second section is comprised of the name of the drug prescribed, the directions for its use, and the maximum daily dose. The third section is reserved for use by the pharmacist to enter information such as his and the drug's identification numbers and the date the drug is dispensed. Tr. at 350-51.
 
 
 10
 In our view, the prescriptions were not admitted to prove the truth of the assertions they contained, and are, therefore, not hearsay. They were not offered to prove Dr. Bashien's or any of his patients' addresses.[7] Nor were they offered to prove the doctor believed that the patient needed the drug prescribed, which is an assertion probably intended by the doctor when he wrote the prescriptions. They were offered in evidence to show they were used to obtain drugs.
 
 
 11
 The conclusion that the prescriptions were not hearsay is strengthened by a review of the rationale of the hearsay rule. "The primary justification for the exclusion of hearsay is the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence." Anderson v. United States, 417 U.S. 211, 220, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974). Appellants' attack on the prescriptions is not directed at the veracity of the statements made or assertions implicit in them. They had no interest in putting Dr. Bashien's credibility in issue. Apparently, appellants' sole objection to the prescriptions dealt with their authenticity, which does not implicate hearsay values. As discussed above, appellants' attack on the authenticity of the prescriptions is groundless.
 
 
 12
 Even if we construed the definition of hearsay in Federal Rule of Evidence 801(c) to include the Bashien prescriptions, they would be explicitly excluded from the scope of hearsay by 801(d)(2)(E), which provides:
 
 
 13
 A statement is not hearsay if (it) is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.
 
 
 14
 Dr. Bashien was indicted for conspiracy, and he pleaded guilty prior to trial. The Government produced sufficient independent evidence of his involvement in the conspiracy to permit the admission of the prescriptions under 801(d)(2) (E). See generally United States v. Gantt, 617 F.2d 831, 844-45 (D.C.Cir.1980).
 
 
 15
 Our determination of the hearsay issue does not require consideration of the parties' dispute over whether the prescriptions were admissible under the business records exception to the hearsay rule. See Fed.R.Evid. 803(6).
 
 3. Confrontation Clause
 
 16
 Our conclusion that the prescriptions were not hearsay likewise dispenses with any Confrontation Clause problem. No purpose would be served by requiring the prosecution to produce a witness at trial to testify concerning non-hearsay statements or, if the witness was not produced, by excluding such statements from evidence altogether. The "hearsay rules and the Confrontation Clause are generally designed to protect similar values." California v. Green, 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970) (quoted in Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)). The confrontation clause, like the hearsay rule, is not concerned with statements that are not offered to prove the truth of the matter asserted.[8]
 
 B. Prior Inconsistent Statements
 
 17
 Myrtle Mae Lynch, Theresa Lucas, John Bruner and Carl Lynch argue that the trial court's failure to give immediate jury instructions following the impeachment of several Government witnesses by their prior statements made to police and before the grand jury was prejudicial error. Appellants claim reliance on United States v. McClain, 440 F.2d 241 (D.C.Cir.1971), and other cases. The Government does not question the need for prompt instructions in most cases such as this, but argues that the trial court met the substance of that rule by giving adequate instructions at the close of the impeached witnesses' testimony and in its final charge to the jury. In addition, the Government urges that if any error was committed it was harmless. In our opinion the district court committed no error.
 
 
 18
 In McClain we held it was plain error for a trial court not to give an immediate limiting instruction following the introduction, for the limited purpose of proving motive, of bad acts testimony against an accused. The court explained:
 
 
 19
 We would hold that whenever evidence is admitted only for a limited purpose, it is plain error, in the absence of manifest waiver, to omit an immediate cautioning instruction. The danger of prejudicial effect from such evidence is so great that only an immediate and contemporaneous instruction can be considered sufficient to protect defendants.
 
 
 20
 United States v. McClain, 440 F.2d 241, 246 (D.C.Cir.1971); but cf. United States v. Garcia, 530 F.2d 650 (5th Cir. 1976) (failure to give limiting instruction on proper use of prior inconsistent statement not plain error).
 
 
 21
 The apparent goals of the appellants in seeking immediate instructions were two: (1) to highlight in the jurors' minds the inconsistency between the trial testimony and the prior statement, and (2) to ensure that the jurors understood that the prior and inconsistent grand jury statements could be used as substantive evidence.[9] The purpose of limiting instructions is to ensure that evidence that is admissible for one purpose but not others is not used by the jury for any improper purpose.[10]
 
 
 22
 We note that each of the impeached witnesses was testifying for the Government and was impeached by one of the defendants. In each instance, the prior statement either gave a less damaging account of an incident described by the witness at trial or suggested that the matter never occurred. The instructions sought by appellants could not properly be characterized as limiting instructions. What appellants requested were instructions explaining the proper purpose of certain evidence. In the typical case, where a prior inconsistent statement is admissible only to impeach, an instruction of the limited nature of the evidence is necessary to ensure that the jury does not use the prior statement as substantive evidence, see Jones v. United States, 385 F.2d 296 (D.C.Cir.1967), since for that purpose the evidence is hearsay. The possibility that the evidence might be used by the jury in an improper manner necessitates the immediate instruction. In this case, under the assumption that without a limiting instruction the jury might use a prior inconsistent statement as substantive evidence, appellants were not harmed by the district court's failure to give immediate instruction since the prior statements were less damaging than the trial testimony.
 
 
 23
 There was no prejudicial effect to the defendants from the admission of the prior inconsistent statements; the statements impeached witnesses against them and, to the extent they could be utilized as substantive evidence, they were exculpatory. Appellants were not entitled to immediate instructions to the jury to the effect that the jury could, on the basis of the prior statements, question the veracity of the witness or disbelieve the trial testimony of the witness and accept his prior statement as the truth. They were, of course, entitled to these instructions at some time. They concede that the court gave the requested instruction numerous times during the trial. This case is in distinct contrast to those where the need for a limiting instruction arises because the prior inconsistent statement adversely affects the interests of the accused and is admissible only for the limited purpose of attacking the credibility of the witness.
 
 
 24
 Under the circumstances the district court was not required to give immediate jury instructions on the proper use of prior inconsistent statements. The court gave such an instruction no fewer than six times during the course of the trial. We find no error.
 
 C. Ineffective Assistance of Counsel
 
 25
 Emma Jean Ward argues that she was denied her Sixth Amendment right to the effective assistance of counsel. She moved the district court for a new trial on this ground. After holding a hearing, the court denied the motion. We have carefully reviewed Ward's arguments, and we conclude that the district court properly decided this issue. We, therefore, affirm the court's order denying Ward a new trial, and we do so on the basis of the court's memorandum which accompanied its order. United States v. Ward, Crim. No. 78-395 (D.D.C.1980) (memorandum denying motion for new trial).
 
 
 26
 D. Failure to Disclose Dismissal of Witness' Indictment
 
 
 27
 Thomas McCloud argues that his conviction under the Travel Act, 18 U.S.C. § 1952, must be reversed because the Government intentionally failed to tell him of the prior existence, and subsequent dismissal during trial, of an indictment against one of the witnesses against him. The Government counters McCloud's argument by noting that the witness, Thelma Dekillian, was recalled after McCloud's lawyer learned from McCloud that Dekillian had been indicted.[11] The Government avers that the testimony of Dekillian, her lawyer, and the prosecutors clearly shows that the testimony against McCloud was not given in exchange for any promise of favorable treatment. Further, the Government urges that any arguable prejudice resulting from the nondisclosure was cured by Dekillian's availability for cross-examination when she was recalled.
 
 
 28
 The record discloses that at the time of Dekillian's original testimony against McCloud, the Government, based on her promise of restitution, had agreed to dismiss an indictment charging her with improperly cashing Government checks. Indeed, the actual dismissal of the indictment occurred in Judge Richey's courtroom the same day Dekillian testified against McCloud in Judge Oberdorfer's court, although Dekillian was not informed of the dismissal until two weeks later, on the day she was recalled in this case. Tr. at 9319. The indictment resulted from the deposit of her mother's Social Security Survival Benefits checks into their joint bank account after her mother's death. Dekillian testified that she notified the Social Security office of her mother's death shortly after it occurred, and when in spite of the notice the checks continued to come in the mail, she thought she must be entitled to them. When Assistant U.S. Attorney Polk, newly assigned to her case, learned that Dekillian had in fact notified the authorities of her mother's death, he first offered to reduce the felony charge to a misdemeanor and then agreed to dismiss the charge altogether upon the execution of a restitution agreement. Assistant U.S. Attorney Harkins, who interviewed Dekillian with respect to her testimony against McCloud, testified that he first learned of the prior indictment against the witness during the course of that interview, which occurred some time after the conspiracy trial had begun. He did not pursue the matter with her, but told her he would contact her lawyer. Tr. at 9166-67. We take notice that the office of the United States Attorney is sufficiently large so that one assistant does not always know what every other assistant is doing in all other cases.
 
 
 29
 Two claims of prosecutorial misconduct can be ascertained from McCloud's brief. First, he contends that the Government deleted or failed to include in the notes of the Harkins' interview with Dekillian the fact that an indictment was outstanding against her. These notes were turned over to McCloud, apparently pursuant to the Jencks Act, 18 U.S.C. 3500. Second, McCloud argues that the existence of the indictment and its dismissal should have been divulged to him under the Brady doctrine,[12] as construed by such cases as United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 392 (1976).
 
 
 30
 We are unpersuaded by McCloud's arguments. The Jencks Act does not require a Government attorney to take verbatim notes of interviews. It only requires the Government to give a copy of a "statement" made by a Government witness to the defense after the witness has testified on direct examination at trial. The Jencks Act did not require disclosure of the notes under current discussion. See 18 U.S.C. 3500(e) ("statement" defined as a "written statement made by (the) witness and signed or otherwise adopted by him ") (emphasis added). There is no indication in the record that Dekillian adopted the notes taken during her interview. Apparently, the Government gave McCloud copies of the notes of the Dekillian interview out of an abundance of caution. In any event there was no violation of the requirements of the Jencks Act.
 
 
 31
 The short answer to McCloud's Brady argument is that McCloud's lawyer learned of the evidence allegedly withheld and was given an opportunity to present that evidence in the only way it held any value for his client, by cross-examining the witness and attempting to impeach her.[13]
 
 
 32
 The evidence does not support a conclusion that there was any orchestrated attempt here to "buy" Dekillian's testimony and then conceal this arrangement from McCloud. Even if the Government had kept the Dekillian indictment from McCloud in bad faith, this would not necessarily require reversal. As the Supreme Court stated in U. S. v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976):
 
 
 33
 In Brady this Court ... expressly rejected the good faith or the bad faith of the prosecutor as the controlling consideration: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The principle of Mooney v. Holohan (294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791) is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." 373 U.S., at 87 (83 S.Ct. at 1196). (emphasis added.) If the nature of the prosecutor's conduct is not controlling in a case like Brady, surely it should not be controlling when the prosecutor has not received a specific request for information.
 
 
 34
 427 U.S. at 110 n.17, 96 S.Ct. at 2400.
 
 
 35
 The evidence that was allegedly withheld here was eventually discovered by the defense during the course of the trial and was presented to the jury. Under the circumstances we find no error.
 
 E. Final Argument
 
 36
 Carl Lynch and Milton Battle claim prejudice resulted from statements made by counsel for their codefendants in their final arguments to the jury. The most objectionable statement was made by Michael Frisch, counsel for Myrtle Lynch. He said: "I'm not going to insult your intelligence. The first premise I begin from is the Government has proved beyond any doubt that Carl Lynch was guilty of running a drug conspiracy." Tr. at 9913. Although no objection was made, Judge Oberdorfer sua sponte called all counsel to the bench for a conference. He concluded that a statement to the jury was necessary. He instructed them: "I want to comment on the remarks that Mr. Frisch made to the effect of the Government's proof with respect to Mr. Lynch. That is argument. That is for you to decide." Tr. at 9914-15.
 
 
 37
 Carl Lynch argues that the statement made by his wife's lawyer, and similar statements made in other closing arguments, irreparably prejudiced his chance for a fair trial. Battle argues that the statement, although not explicitly naming him, clearly implicated him because it suggested that the Government had established the existence of the conspiracy beyond any doubt. He argues that the district court erred in not declaring a mistrial, even though he acknowledges that no such motion was made.[14] Brief of Milton Battle at 44. The Government urges that the statement was fair comment on the evidence, and that in any event hostility among codefendants does not prohibit joint trials. Finally, it suggests that any prejudice was relieved by the court's immediate cautionary instruction. We agree.
 
 
 38
 The parties have not directed our attention to any cases presenting a similar issue. We find some assistance in cases such as United States v. Ehrlichman, 546 F.2d 910, 929 (D.C.Cir.1976), cert. denied, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977), and United States v. Haldeman, 559 F.2d 31, 71 (D.C.Cir.1976) (en banc), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), which held that " 'the mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another (are) insufficient grounds to require separate trials.' " 546 F.2d at 929 (quoting United States v. Barber, 442 F.2d 517, 530 (3d Cir.), cert. denied, 404 U.S. 846, 958, 92 S.Ct. 148, 327, 30 L.Ed.2d 83, 275 (1971)); see 559 F.2d at 71. Cf. United States v. Vinson, 606 F.2d 149, 154 (6th Cir. 1979) ("(a)bsent some indication that the antagonism between co-defendants misled or confused the jury, the mere fact that co-defendants attempt to blame each other does not compel severance"), cert. denied, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980).
 
 
 39
 Lynch claims this principle is inapposite since he is not arguing that the trial court erred in failing to sever his case. Implicit in the holding that hostility among codefendants does not necessarily require separate trials, however, is a recognition that such hostility may surface at the joint trial without unduly prejudicing the object of the hostile remark.
 
 
 40
 We believe the district court acted properly. As soon as Myrtle Lynch's lawyer made the objectionable statement, the court interrupted the argument and instructed the jury that the lawyer's remark was only argument, not evidence. None of the defendants objected or moved for a mistrial. See note 13 supra. Under the circumstances we find no error.
 
 F. Severance
 
 41
 Milton Battle and John Bruner both make severance arguments. Battle argues that the trial court erred in denying Carl Lynch's pretrial motion to sever his case for trial, which motion Battle adopted. Bruner argues that his motion to sever, made before trial and renewed once during the trial, should have been granted. Both Battle and Bruner urge that severance was required because the quantity of evidence against them was small in comparison to the overwhelming amounts amassed against Carl Lynch.[15] They argue that the overwhelming evidence against Lynch had a necessary "spillover" effect, making it impossible for them to receive a fair trial. Bruner also argues that the joint trial hampered his ability to present his defense that he was involved in a separate conspiracy from the one led by Carl Lynch.
 
 
 42
 The Federal Rules of Criminal Procedure provide:
 
 
 43
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justices requires.
 
 Fed.R.Crim.P. 14. Recently we observed:
 
 44
 The trial court has great discretion in severance matters, with the balance generally to be "struck in favor of joint trials." United States v. Hines, 455 F.2d 1317, 1334, cert. denied, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972).
 
 
 45
 Absent a dramatic disparity of evidence, any prejudice caused by joinder is best dealt with by instructions to the jury to give individual considerations to each defendant. United States v. Haldeman, 559 F.2d 31, 72 (1976), cert. denied, 431 U.S. 933 (97 S.Ct. 2641, 53 L.Ed.2d 250) (1977).
 
 
 46
 ... The evidence (against the moving defendant) was independent and substantial. The trial judge properly instructed the jury to determine the guilt or innocence of each defendant separately.
 
 
 47
 United States v. Slade, 627 F.2d 293, 309-10 (D.C.Cir.), cert. denied, --- U.S. ----, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980). We have also stated that severance is required when the evidence against one defendant is "far more damaging" than the evidence against the moving party. United States v. Mardian, 546 F.2d 973, 977 (D.C.Cir.1976) (en banc) (citing, e. g., United States v. Bolden, 514 F.2d 1301, 1310 (D.C.Cir.1975)). In Mardian there was a very great disparity in evidence and under the controlling principles we find no abuse of the district court's discretion.
 
 
 48
 A comparison with two of our cases where we held the district court had improperly denied severance highlights the propriety of the district court's decision here. In United States v. Mardian, 546 F.2d 973 (D.C.Cir.1976) (en banc), we held that Robert Mardian should have been severed from his codefendants in the Watergate coverup trial. Even though Mardian participated, if at all, in the conspiracy for a relatively short period and hence the evidence against him was proportionately small, we held that this alone was insufficient to require severance. It was only when his lawyer became ill during the trial and was thus unable to continue his representation that we found that the district court's failure to grant his motion for severance constituted an abuse of discretion. Id. at 979-80.
 
 
 49
 More recently we determined that the district court improperly failed to grant a severance in United States v. Novo Sampol, 636 F.2d 621 (D.C.Cir.1980), which involved the prosecution resulting from the assassination of former Chilean Ambassador Orlando Letelier and his associate. We decided that the combination of the following factors required a determination that the district court had abused its discretion in refusing to grant Ignacio Novo Sampol's motion for severance. (1) Ignacio had been charged only with misprision of a felony and making false statements to a grand jury, whereas his codefendants were on trial for conspiring to murder and murdering Letelier and his associate. Given the "gross disparity in the quantity and venality of the testimony against the respective joint defendants" we found it "unreasonable to expect that the jury succeeded in compartmentalizing the evidence adduced at this trial." Id. at 647 (emphasis in original) (citing, e. g., United States v. Gaines, 563 F.2d 1352, 1355 (9th Cir. 1977)). (2) Ignacio's involvement as a leader of an organization that was implicated in the conspiracy "created the false impression that Ignacio was (personally) involved in the conspiracy." 636 F.2d at 644. (3) The joint trial "deprive(d) Ignacio of at least some opportunity to cross-examine witnesses and introduce evidence." Id. at 648.
 
 
 50
 Except for Bruner's argument that he was prohibited from effectively presenting his defense,[16] both defendants argue that the disparity in evidence between them and Lynch alone required severance. We agree with appellants that the evidence against Lynch was substantial. But that is not to say that there was not independent and substantial evidence against Bruner and Battle as well. Battle was named as a "team leader" in the Philadelphia network by three witnesses. He was identified by a receptionist at one of the doctor's offices where drugs were obtained, and he participated in trips to Pittsburgh, Atlanta and Birmingham. The testimony at trial indicated that Bruner was involved in both the Philadelphia and New York networks, and in the distribution of Preludin and Dilaudid in Washington. We are unable to say that the disparity in the evidence was dramatic or that the evidence against Lynch was "far more damaging" than the evidence against Battle and Bruner.
 
 
 51
 The district court properly instructed the jury that they should consider the guilt or innocence of each defendant independently. Tr. at 10,170-71. Our review of the record convinces us the jurors could reasonably compartmentalize the evidence presented. Recognizing the strong federal interest in joint trials, see United States v. Leonard, 494 F.2d 955, 965 (D.C.Cir.1974) (quoting United States v. Hines, 455 F.2d 1317, 1334 (1971), cert. denied, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972)), and the broad deference accorded the district court's discretion, we find no error in the district court's refusal to grant the defendants' motions for severance.
 
 G. "Bad Acts" Evidence
 
 52
 Carl Lynch contends that the district court erred in overruling his objections to testimony concerning his violent behavior and sexual habits. He claims it is character evidence, and that any minimal probative value this evidence had was outweighed by its danger of unfair prejudice. The Government contends that the evidence of Lynch's violent behavior was probative of Lynch's leadership role in the conspiracy. It similarly suggests that the evidence of Lynch's sexual proclivities was relevant to the relationships of coconspirators to each other and to the conspiracy.
 
 
 53
 We understand Lynch's argument to raise issues under both Federal Rules of Evidence 404(b) and 403. We are guided in our analysis of these rules by our recent decision in United States v. Foskey, 636 F.2d 517, 523-26 (D.C.Cir.1980). We held in Foskey that proper analysis of the admissibility of "bad acts" evidence involves two factors. First, it must be determined whether the evidence's "sole tendency is to prove that the defendant is a person of bad character and thus predisposed to commit the crime for which he is on trial." Id. at 523. If so, then the evidence must be excluded under Rule 404(b). If not, and the evidence is relevant to some issue in the trial such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," Fed.R.Evid. 404(b), then the second factor in the analysis must be taken.
 
 
 54
 This step requires discussion of Rule 403, which states that even relevant
 
 
 55
 evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 56
 We recognized in Foskey that "the balancing contemplated by Rule 403 is a matter within the discretion of the trial court and should be overturned on appeal only in cases of abuse of that discretion ...." 636 F.2d at 525.
 
 1. Sexual Behavior
 
 57
 Lynch has tried to make more of this evidence than the record justifies. He states in his brief:
 
 
 58
 Mr. Lynch's image as a bad man who must be guilty of the crimes with which he was charged was darkened ... by references and allusions to him depicting him as one who enjoyed the sexual favors of many women. These peppered the prosecution's case. The resulting image of depravity was enlarged by the fact that his wife sat with him in the dock, a fellow defendant, a constant reminder that Mr. Lynch was a married man. There was testimony in abundance indicating that this, that or another woman was Mr. Lynch's girlfriend or mistress.
 
 
 59
 Brief of Carl Lynch at 14-15. Lynch then sets out fifteen references to the record where, given his argument, one would reasonably expect to find testimony of sexual liaisons elicited by the Government. An examination of the record reveals nothing of the sort. Most of the references are similar to that set forth in the margin.[17] We do not construe such testimony to be character evidence. It requires no discussion of Rules 403 and 404(b). In addition, in all but one of the instances of allegedly objectionable testimony there is no objection in the record claiming that the evidence is inadmissible character evidence. The one objection followed the testimony set forth in the margin.[18]
 
 
 60
 Many of the portions of the record cited by Lynch to support his argument that he was painted as a bad man because of his promiscuity came in response to questions by Lynch's codefendants, and not the Government. This is not to say that testimony elicited by a codefendant cannot be prejudicial. But it does undercut Lynch's argument that reversible error resulted from the Government's failure to argue the relevance of the evidence of sexual relationships to the jury. Under the circumstances of this case we do not find that the evidence adduced at trial that tended to show that Carl Lynch had girlfriends other than his wife requires a consideration of the admissibility of that evidence under Federal Rules of Evidence 403 and 404(b).
 
 2. Violent Acts
 
 61
 Unlike the evidence of sexual relationships, the evidence offered at trial describing certain violent acts committed by Mr. Lynch clearly calls into play Rules 403 and 404(b). We find, however, that the district court properly admitted the evidence.
 
 
 62
 a. Rule 404(b).
 
 
 63
 There can be little serious doubt that this evidence was relevant. As evidenced by Lynch's own summary, Brief of Carl Lynch at 13-14, most of the violent acts followed accusations that the victim had either stolen money or drugs intended for Lynch. The evidence was clearly probative of Lynch's leadership role in the conspiracy, as well as the roles of the victims, many of whom continued to participate in the conspiracy even after the physical abuse.
 
 
 64
 b. Rule 403.
 
 
 65
 We next turn to the second factor in applying the rule whether the testimony should nonetheless have been excluded because danger of unfair prejudice outweighed its probative value. After carefully reviewing the incidents of violence cited by Lynch in his brief, we conclude that the trial court did not abuse its discretion in admitting the evidence. The court stated its position on the evidence of violent acts when it denied Lynch's motion to limit the number of witnesses testifying on the subject:
 
 
 66
 The Court has reviewed carefully defendant's motion and has stated on the record on several occasions its sensitivity to the possible prejudice which may result from proof of violent or otherwise sensational acts. Its review of the transcripts convinces the Court that the Government has acted to limit very carefully such events to avoid prejudicial description, questioning witnesses as to only the occurrence of a limited number of events; the Court is also aware, from the Government's proffer, of a number of incidents which have not been introduced. Rather than adopting a blanket rule, the Court will continue its policy of considering carefully the admission of such evidence when proffered; the Court again solicits the assistance of the parties in that regard. On that basis the motion is denied.
 
 
 67
 Tr. at 5312-13.
 
 
 68
 Most of the testimony of violent acts was elicited by the Government asking the witness a leading question, pursuant to an agreement between the Government and Lynch's lawyer. The following exchange is a representative example:
 
 
 69
 Q. While you were there, did Mr. Lynch have occasion to beat Gail and Jean?
 
 
 70
 A. Yes.
 
 
 71
 Tr. at 7441-42. We believe the trial court took the necessary precautions to insure that the evidence was not presented in a way that would unfairly prejudice Lynch.
 
 
 72
 Lynch argues that error resulted from the failure of the Government to "conduct its presentation of such evidence in a manner likely to make clear to the jurors the limited purpose for which it is properly admissible." United States v. DeLoach, 654 F.2d 763 (D.C.Cir. 1980) (Tamm, J., concurring). Although the Government does not suggest that it argued its purpose for presenting the evidence of violent acts to the jury, we note that it did not have the benefit of this court's direction in Foskey and DeLoach. More importantly, Lynch has not contended that the Government argued the evidence to the jury in an impermissible manner. Our review of the record persuades us that given the method by which this evidence was presented at trial, it would not result in the jury believing Lynch was more likely to have committed the crimes with which he was charged because he was a "bad" man. Rather the testimony, to the extent that it encompassed "bad" acts, had a legitimate probative effect in that it tended to prove the nature of Lynch's management role in the conspiracy to show his particular relationship to the conspiracy and to the other conspirators. This was an essential element of the Government's case, the probative value of the evidence thereon outweighed any unfair prejudice, and the Government was entitled to prove that feature of its case by the best available evidence. No error was committed by its introduction.
 
 H. In-Court Identifications
 
 73
 Theresa Lucas claims she was denied due process because the trial court permitted two witnesses, Jenkins and Joines, to make in-court identifications of her after they had seen an array of photographs that included her picture. She claims the identification procedure was unnecessarily suggestive, and that the Government failed to carry its burden of establishing that the in-court identifications were based on a source independent of the allegedly suggestive photographic display. Lucas also argues along with Myrtle Lynch that the trial court erred in not permitting them to leave the courtroom during the voir dire of the witness Ruth Helen Campbell concerning her in-court identification of the defendants. The Government argues that the photographic array was not impermissibly suggestive and that in any event there existed an independent basis for the in-court identifications. The Government contends that the defendants' presence in the courtroom during the voir dire of Campbell was necessary so that the purpose of the voir dire to determine the witness' ability to make a positive identification could be fulfilled.
 
 
 74
 Identification testimony must be excluded if a prior photographic identification procedure is so "impermissibly suggestive" that "under all the circumstances of (the) case there is 'a very substantial likelihood of irreparable misidentification.' " Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977) (quoting Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1274 (1968)). The initial question is thus whether the procedure was impermissibly suggestive.
 
 
 75
 Lucas urges that the photographic array was suggestive in two respects. First, she claims all the photographs, except hers, which showed her standing beside Carl Lynch, depicted females only. She argues that since the two witnesses who were shown the array were aware that Carl Lynch was the leader of a conspiracy and that she was his girlfriend, the picture of her with Lynch "was tantamount to directing the identification of Lucas." Joint Brief of Lucas and Myrtle Lynch at 71. Second, she suggests the other photographs in the array did not depict individuals with characteristics similar to hers. She argues that the witnesses had described her as wearing thick glasses and having buck teeth, and that no individual with those characteristics besides her was included in any of the photographs in the array.
 
 
 76
 An examination of the photographic array, Exhibit 535, reveals that the identification procedure was not unnecessarily suggestive. And, even assuming that it was, a review of the identification procedures that were followed indicates that there was no " 'substantial likelihood of irreparable misidentification.' " 432 U.S. at 116, 97 S.Ct. at 2254 (quoting 390 U.S. at 384, 88 S.Ct. at 971).
 
 
 77
 Lucas' claim that the identification procedure was unnecessarily suggestive is belied by the fact that the photographic album, which contained 85 photographs, contained five pictures of men with women and one other picture of Carl Lynch with a woman and another man. Tr. at 2588, Exhibit 535, Insert 1, picture C. Additionally, there were also 10 photographs of women with glasses and about nine women whose teeth did not appear to be substantially different from Lucas'. The fact that Lucas was in a photograph with "Cobby" Lynch and she was reputed to be a "girlfriend" of Cobby's would not suggest that the picture was of her because Cobby was also reputed to have other girlfriends. Moreover, the picture of her with Cobby was a poor one and it could not be determined from it that she had thick glasses, or that she had anything wrong with one of her eyes. We thus conclude that the identification procedure was not unnecessarily suggestive. But, even assuming that it was, we conclude that the trial court properly permitted the identification testimony.
 
 
 78
 After conducting voir dire of Jenkins, Joines, and Detective Larman (who prepared the photographic array and showed it to Joines), the district court refused to strike the identification testimony. The court later elaborated on its reasons for permitting the in-court identification when it denied Lucas' motion to suppress Joines' identification and her motion for further voir dire with respect to Jenkins' identification.
 
 
 79
 The court listed five factors to support its denial of the motion to suppress the identification by Joines. First, the witness was shown the array of approximately 80 photographs, and was told only to look for people she knew. She was not directed to search out anyone, including Lucas, in particular. Second, Joines testified credibly concerning her meeting with Lucas and was able to describe her accurately before being shown a photograph. Third, Joines testified plausibly concerning distinctive characteristics of Lucas, including her thick glasses and buck teeth, and that her identification of Lucas in the photograph was based on her recollection of those physical characteristics. Fourth, Lucas had the distinctive characteristics described by Joines. Finally, as noted above, the picture of Lucas was not of good quality and did not show the thickness of her glasses. All this suggested the strength of Joines' recollection independent of the photograph. In denying Lucas' motion for further voir dire with respect to Jenkins, the court noted that it was clear from the record that Jenkins had no recollection of seeing Lucas' photograph in the array. It was thus proved by substantial evidence that her identification of Lucas was based on her memory of having seen her previously and not as a recollection from any photograph.
 
 
 80
 We agree with the district court that the in-court identifications were properly admitted. The court's voir dire of the witnesses indicated that the circumstances did not create "a very substantial likelihood of irreparable misidentification."
 
 
 81
 We now turn to the question whether the court erred in not permitting the defendants to absent themselves during the voir dire of a witness concerning her identification testimony. In support of their argument that the court erred in not permitting them to leave the courtroom during Campbell's voir dire, Lucas and Lynch cite Singletary v. United States, 383 A.2d 1064 (D.C.1978). In Singletary the District of Columbia Court of Appeals held that a defendant has a right to absent himself from a pretrial hearing on a motion to suppress identification testimony. The basis for defendant's motion was his claim that there had been an impermissibly suggestive pretrial confrontation at a show-up. The District of Columbia Court of Appeals treated the confrontation at the suppression hearing like any other unnecessarily suggestive pretrial confrontation, and concluded that
 
 
 82
 although it was improper for the trial court to refuse the defendants' request that he be allowed to absent himself from the pretrial suppression hearing, it was not error to permit the subsequent in-court identification of the defendant since an independent source existed for the identification, and any suggestivity inherent in the defendant's attendance at the suppression hearing was not sufficient to vitiate this independent source.
 
 
 83
 383 A.2d at 1072.
 
 
 84
 Singletary, of course, is not binding on this court, and it is easily distinguishable from this case. There is no allegation here that any pretrial confrontation, by lineup, show-up, photographs, or otherwise, tainted Campbell's in-court identification. The purpose of the voir dire proceeding, which was requested by the lawyers for Lucas and Lynch, was thus not to determine if a due process violation had occurred, but was intended to assess the witness' ability to identify the defendants. There would have been little use for a voir dire proceeding with such objective if Lynch and Lucas were not present. If they doubted the ability of Campbell to identify them, they should have foregone the voir dire, so that any indecision displayed by the witness in identification would be observed by the jury. Under the circumstances, Singletary is distinguishable, and we find no reason to question the district court's decision to refuse the defendants permission to leave the courtroom during the voir dire of Campbell.
 
 I. Probable Cause for Searches
 
 85
 Theresa Lucas and Myrtle Lynch contend that evidence obtained from their respective residences that was admitted at trial should have been suppressed because the searches were unconstitutional in that probable cause was not shown in the affidavits supporting the search warrants.[19] They both suggest that statements in the affidavits attributed to unidentified informants could not demonstrate probable cause because the standards of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), were not met. Lynch, in addition, urges that the information in the affidavit supporting the search warrant executed at her home was stale. Finally, both argue that the searches as warranted were overbroad. The Government responds that the searches were in all respects conducted in accordance with the Fourth Amendment.
 
 1. Information from Informants
 
 86
 When an affidavit relies on hearsay from police informants,
 
 
 87
 the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant ... was "credible" or his information "reliable."
 
 
 88
 Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964). This dual test consists of, first, a "basis of knowledge" requirement predicated upon the revelation of facts "which permit the judicial officer making the probable cause determination to reach a judgment as to whether the informant had a basis for his allegations ... that evidence of crime would be found at a certain place," and, second, a showing of "veracity," which requires that "facts ... be brought before the judicial officer so that he may determine either the inherent credibility of the informant or the reliability of his information on this particular occasion." 1 W. LaFave, Search and Seizure § 3.3, at 501-02 (1978) (emphasis in original) (quoting Moylan, Hearsay and Probable Cause: An Aguilar and Spinelli Primer, 25 Mercer L.Rev. 741, 755, 773 (1974)).
 
 
 89
 These principles must be applied to test the affidavits accompanying the warrants for the searches of the Lynch residence, 2509 St. Clair Drive, Hillcrest Heights, Maryland, and the Lucas residence, 4714 9th Street, N.W., Washington, D.C.
 
 
 90
 a. "St Clair" Affidavit.
 
 
 91
 This affidavit was prepared by Detective Larman of the Washington Metropolitan Police Department. Government's Brief at 97-100 (app.). To establish probable cause Larman's affidavit recites statements of two unidentified informants. In the affidavit Larman described the first as "a previously reliable source of information, who has proven to be reliable in narcotics cases in the past." Government's Brief at 98 (app.) (emphasis added). The second informant is referred to as "another previously reliable source who has provided accurate information on numerous occasions." Id. (emphasis added). These statements meet the "credibility" and "reliability" requirements of Aguilar, 378 U.S. at 114, 84 S.Ct. at 1514. As we said in United States v. Watts, 540 F.2d 1093 (D.C.Cir.1976):
 
 
 92
 Although a bare recital that an unnamed defendant is "credible" or "reliable" or "prudent," without offering any factual basis for that conclusion is plainly inadequate, the assertion that the source had previously given correct information concerning narcotics violators is entitled to weight as a factor establishing previous reliability. The affidavit in Jones v. United States, 362 U.S. 257, 267 n.2, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960), contained a similar recital, and the Jones affidavit has been cited by the Court in subsequent decisions as a "suitable benchmark" for judging "what quantum of information is necessary to support a brief that an unidentified informant's information is truthful." Most lower courts have followed the example of Jones in permitting magistrate reliance on a recital that the informant had previously given correct information, without requiring further factual elaboration of past reliability.
 
 
 93
 Of course, such a recital, standing alone, may not be enough. In Jones the informant's tip, reciting that he had purchased narcotics from defendant in his apartment, was corroborated by "other sources" ....
 
 
 94
 540 F.2d at 1097-98 (emphasis added) (footnotes omitted) (quoting United States v. Harris, 403 U.S. 573, 580, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723 (1971) (plurality opinion)).
 
 
 95
 In this case we have two previously proven reliable sources and ample corroborating information. First, since both informants stated that Carl Lynch showed them a display of narcotics at the "St. Clair" residence, the statements were mutually corroborative. In addition, Larman swore that he had learned from "three persons who worked for or with Lynch in the narcotic business"[20] and from reviewing the minutes of grand jury proceedings that Carl Lynch had been heavily involved in a multi-state drug trafficking operation for the past six years. Finally, Larman related other, less-reliable information corroborating the stories of the two critical informants. In our view the magistrate properly concluded from the statements that the two principal informants had provided reliable information in the past and the fact that the principal informants' statements were corroborated by the other statements in the affidavits, that the credibility of the informants and the reliability of this particular information was sufficiently established.
 
 
 96
 As for the "basis of knowledge" aspect of the Aguilar test, it is satisfied if the affidavit discloses "some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were." Aguilar v. Texas, 378 U.S. at 114, 84 S.Ct. at 1514. This requirement is easily satisfied here. The affiant states that the first informant was told by Carl Lynch that he "maintained, in his home, a sample of every type of pill he has distributed, along with other drug paraphernalia, in a display cabinet." Government's Brief at 98 (app.). The affidavit also indicates that this source visited Carl Lynch in the "Summer of 1977" at this residence and was shown such a display cabinet, which contained many Preludin as well as other types of pills. This source was also told by Lynch that he keeps the revenue from his Preludin sales in his home. The second informant similarly had seen the display cabinet at the St. Clair residence in the "late Summer or early Fall of 1977." The basis-of-knowledge requirement was thus satisfied in one of the most effective ways by the informants' assertions of their visual observation of evidence of crime at a certain place. 1 W. LaFave, supra, § 3.3, at 536-37.
 
 
 97
 b. "9th Street" Affidavit.
 
 
 98
 This affidavit, also prepared by Detective Larman, Government's Brief at 91-96 (app.), follows the pattern of the "St. Clair" affidavit. The affiant described Carl Lynch's involvement as a major drug trafficker in the Washington area based on Larman's review of sworn grand jury testimony and his interviews with "numerous persons." Government's Brief at 93 (app.). The probable cause for the search of the described premises is predicated upon statements attributed to two informants, designated S-1 and S-2. We do not find it necessary to scrutinize under Aguilar the statement of the informant designated S-1 because we find that the statements attributed to S-2 clearly constitute probable cause.
 
 
 99
 Larman described S-2 as a "source who has been reliable on narcotic cases in that it has been responsible for obtaining search warrants in both narcotics and weapons cases. This source has never been found to be unreliable." Government's Brief at 94 (app.). The sworn statement that the source has been responsible for obtaining search warrants on prior occasions and "has never been found to be unreliable" is sufficient to establish veracity. Fairly read,[21] this suffices to enable the magistrate to determine the credibility of the informant. The corroborative information cited in the affidavit, which includes "documented evidence," bolsters the view that this particular information from the source is reliable.
 
 
 100
 Lucas concedes that with respect to S-2 the affidavit meets the basis-of-knowledge requirement, and, we might add, with good reason. The affidavit indicated that within the past seven days S-2 had been in the dwelling on 9th Street, in which S-2 claimed Lynch stored his drugs, and while there had seen drugs and a photograph of a doctor in a compromising position, which was being used by Lynch to blackmail the doctor into prescribing ever-larger quantities of Preludin. This clearly shows the informant's basis for his belief that the photograph and drugs would be in the dwelling.
 
 
 101
 We thus conclude that both affidavits are sufficient under Aguilar.
 
 2. Staleness
 
 102
 Myrtle Lynch argues that the affidavit supporting the warrant for the search of her home contained stale information which did not justify a finding of probable cause. Both sides agree that the crucial question is whether there was probable cause for the search at the time the warrant was issued. See Sgro v. United States, 287 U.S. 206, 210-11, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932); Schoeneman v. United States, 317 F.2d 173, 177 (D.C.Cir.1963). The search warrant was approved by the magistrate on January 6, 1978. The affidavit indicated that one source had seen a drug display cabinet at the St. Clair residence in the "Summer of 1977," and that another had seen the same cabinet at the residence in the "late Summer or early Fall of 1977." Government's Brief at 98 (app.).
 
 
 103
 In determining the likelihood that certain items will still be located in a place where they have earlier been seen, the following analysis is appropriate.
 
 
 104
 The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc.
 
 
 105
 Andresen v. State, 331 A.2d 78, 106 (Md.Ct.Spec.App.1975), aff'd, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976).
 
 
 106
 The affidavit indicated that Carl Lynch had been involved in an interstate drug operation for six years, and that he had been selling drugs on the street in the District of Columbia for that period. The St. Clair address was described as his residence. The affidavit indicated that Lynch had told one of the affidavit's two principal informants "that he had maintained (the drug display cabinet) since he started selling drugs and would continue to put new pills in it as he started dealing in them." Government's Brief at 98 (app.) (emphasis added). Thus, the affidavit described a cabinet used to display drugs at the home of a longtime resident of the Washington, D.C. area who had been heavily involved in a multi-state drug conspiracy for many years. This cabinet according to Lynch's own statement had been in his home for several years and it had been seen in the residence some four to five months prior to the time the affidavit was presented to the magistrate. Most importantly, the affidavit indicated that Lynch intended to keep the drug display cabinet as long as he dealt drugs. This, when coupled with the reasonable inference from the background information in the affidavit indicating that Lynch had been involved in a major drug conspiracy for over six years that the conspiracy continued to exist, made it ultimately reasonable for the magistrate to find there was probable cause to believe that the display cabinet containing the contraband drugs was still within the St. Clair residence at the time he issued the warrant.
 
 3. Overbreadth
 
 107
 Myrtle Lynch and Theresa Lucas also contend that the warrants were overbroad, claiming the supporting affidavits alleged insufficient facts to support the seizure of anything but contraband and photographs. Besides permitting the seizure of Preludin and other drugs, the warrants permitted the seizure of drug paraphernalia, including that which might be used in the preparation of Preludin for distribution, and evidence of the identities of members of the conspiracy and persons who might have control over the searched premises.
 
 
 108
 Both affidavits contain statements of reliable informants who had seen drugs on the premises named in the search warrants. The affidavits also showed that the drugs in the residences were there as a result of a drug trafficking conspiracy. Giving the affidavits a "sensible" and "pragmatic reading,"[22] we conclude they adequately justified the magistrate in issuing warrants to search the premises for paraphernalia necessary to a drug distribution network and for evidence of the participants in the conspiracy or persons in control of the premises.
 
 J. Sentencing
 
 109
 Carl Lynch and Emma Jean Ward argue that their cases must be remanded to the district court for resentencing because of a recent Supreme Court case. In Bifulco v. United States, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980), the Court held that a special parole term may not be imposed as a penalty for a conspiracy conviction under the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 801 et seq. The Government agrees that Bifulco requires the vacation of any sentence on the conspiracy count which included a special parole term. Government's Brief at 90 n.106. We thus remand to the district court so that Lynch and Ward, as well as any other appellant who might have received a sentence prohibited by Bifulco, can be resentenced on the conspiracy count.
 
 III. CONCLUSION
 
 110
 We have fully considered the other arguments made by appellants and conclude that all are without merit. Thus, we remand to permit the necessary resentencing and otherwise affirm.
 
 
 111
 Judgment accordingly.
 
 
 
 *
 Student Counsel
 
 
 **
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 An earlier trial ended in a mistrial when Judge Flannery took ill and no other district judge was available to replace him. After the case was reassigned to Judge Oberdorfer, appellants claimed double jeopardy and moved to dismiss. Judge Oberdorfer denied the motion, and this court affirmed. United States v. Lynch, 598 F.2d 132 (D.C.Cir.1978), aff'g 467 F.Supp. 575 (D.D.C.1978), cert. denied, 440 U.S. 939, 99 S.Ct. 1287, 59 L.Ed.2d 498 (1979)
 
 
 [2]
 In addition to the seven appellants, fourteen other individuals were indicted; the indictment also named 62 unindicted coconspirators
 Each appellant was charged with conspiring to possess and distribute the controlled substances phenmetrazine (trade name Preludin) and hydromorphone (trade name Dilaudid), in violation of 21 U.S.C. §§ 841(a), 846, and with traveling in interstate commerce in aid of a racketeering enterprise, in violation of 18 U.S.C. §§ 1952, 2. In addition, Carl Lynch was charged with engaging in a continuing criminal enterprise, 21 U.S.C. § 848, unlawfully distributing Preludin and Dilaudid, 21 U.S.C. § 841(a), and unlawfully distributing Preludin to a minor, 21 U.S.C. § 845(a); Theresa Lucas was charged with unlawfully distributing Preludin to a minor; and Emma Jean Ward was charged with unlawfully distributing Preludin.
 
 
 [3]
 All of the appellants except Thomas McCloud were found guilty on the conspiracy count. In addition, Carl Lynch was found guilty of engaging in a continuing criminal enterprise, distributing Preludin, distributing Preludin to a minor, and traveling in interstate commerce to promote racketeering. Theresa Lucas was found guilty of distributing Preludin to a minor and traveling in interstate commerce to promote racketeering. Emma Jean Ward, Milton Battle, Myrtle Lynch, James Bruner, and Thomas McCloud were found guilty of traveling in interstate commerce to promote racketeering
 Appellants were sentenced as follows: Carl Lynch received concurrent terms of five years for conspiracy and fifteen years for continuing criminal enterprise, to run consecutively to concurrent five year terms on the remaining counts. Battle, Bruner, Lucas, McCloud, and Myrtle Lynch were sentenced to terms of imprisonment of one-to-three years. Ward was sentenced to four years for conspiracy to run consecutively to concurrent one-to-four year terms on her remaining counts.
 
 
 [4]
 Preludin and Dilaudid are both Schedule II drugs under 21 U.S.C. § 812
 
 
 [5]
 The doctor keeps one copy of the prescription and sends the original and the other copy with the patient. When the prescription is presented at the pharmacy, the pharmacy keeps the original and sends the other copy to the state
 
 
 [6]
 Two of the subpoenaed prescriptions had been issued by the state to another doctor, but the signature on the prescription was Dr. Bashien's
 
 
 [7]
 Indeed, the Government intended to show that the patient information was often false. Tr. at 367-68
 
 
 [8]
 The confrontation clause is not violated by the admission of an out-of-court statement made by a coconspirator. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)
 
 
 [9]
 A statement is not hearsay if ... (t)he declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition
 Fed.R.Evid. 801(d)(1)(A).
 
 
 [10]
 Federal Rule of Evidence 105 provides:
 When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.
 
 
 [11]
 McCloud's lawyer learned of the Dekillian indictment when McCloud told him twelve days after Dekillian's testimony "that there was a rumor around the apartment house that she might be in trouble for cashing government checks." McCloud's Brief at 3
 
 
 [12]
 Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)
 
 
 [13]
 This court recently stated that the Brady rule "applies both when the testimony relates directly to an essential element of the government's proof and when it affects the credibility of a crucial witness." United States v. Iverson, 637 F.2d 799, 801 (D.C.Cir.1980), modified on petition for rehearing, 648 F.2d 737 (D.C.Cir.1981). We have no reason to decide whether Dekillian was a "crucial" witness since, even if she was, her availability for cross-examination when she was recalled satisfied the dictates of due process
 
 
 [14]
 Battle's lawyer excuses his failure to move for a mistrial by claiming that the number of counsel involved made it difficult to hear statements at the bench, and he thought a mistrial had been requested. We find no reason to consider this claim, since we would find no error in the district court's action under either a plain error or abuse of discretion standard
 
 
 [15]
 Bruner states that the evidence was also overwhelming as to Emma Jean Ward
 
 
 [16]
 We reject Bruner's argument that the sophistication of his multiple conspiracy argument could not be grasped by the jury because of the joint trial. We note that the district court properly instructed the jury on the issue of multiple conspiracies, tr. at 10,185, and the fact that a defendant "would have had a better chance of acquittal had he been tried alone (does) not justify a severance." United States v. Brooks, 567 F.2d 134, 139 (D.C.Cir.1977)
 
 
 [17]
 By Mr. Mueller (for the Government):
 Q Miss Crum, I would like to ask you a question that I omitted to ask you previously:
 Whether or not you know a person by the name of Emma Jean Ward?
 A Yes.
 Q And how do you know her, please?
 A She is a friend of my cousin, Cobby.
 Tr. at 1870.
 Q (by the Government) Do you know anybody by the name of Stripper?
 A (Jeanette Crum) Oh, yes.
 Q How do you know that person?
 A I met her through my cousin, Cobby.
 Q Do you know a Myrtle Lynch?
 A Yes.
 Q And
 A My cousin, Cobby's wife.
 ....
 Q Do you know a woman by the name of Theresa Lucas?
 A Yes.
 Q How do you know her?
 A She's a friend of my cousin's, Cobby.
 Tr. at 1858.
 Q (by the Government) Tell us the circumstances under which you met the woman named Theresa?
 A (Sandra Beverly Jenkins) Theresa was the woman's house we went to on N street.
 Q What happened there? What did you meet or hear or see or talk about with her?
 A I asked Jeanette whose house we was going into. And she said Theresa's and I asked who was Theresa and it was supposed to have been Cobby's girlfriend.
 Tr. at 2442.
 
 
 [18]
 Q (Michael Frisch, counsel for defendant Myrtle Lynch) Do you know what Michelle Hebron's relationship was with Carl Lynch?
 A (Donna Dickerson) Yes.
 Q What was that?
 A It was supposed to have been girlfriend.
 Q Where did you know that from?
 A Michelle told me.
 Q Okay. And what did she tell you?
 A She told me that her and Cobby had a thing going on, because Michelle never kept nothing from me.
 She said they had a thing going on, and she asked me how how does she think they're going to make it out.
 I said, well, really, I I can't judge that. I can only judge my own. The best I could tell you, you could work it out with him and hang in there.
 Q Did Michelle Hebron ever tell you she was in love with Carl Lynch?
 Mr. Bailey (counsel for Carl Lynch): Objection, Your Honor. May we approach the bench?
 Tr. at 3158. At the bench the court asked Mr. Frisch what he was trying to accomplish with this line of questioning. He stated that establishing the existence of Carl Lynch's girlfriends would provide a motive for him to conceal her existence from his wife, Mr. Frisch's client. Tr. at 3160. This would support Frisch's argument that his client Carl Lynch's wife was not aware of the existence of the conspiracy. Also, establishing a relationship between Carl Lynch and a future witness could be used to attack any testimony that witness might give against Myrtle Lynch. Apparently the main concern of Mr. Bailey, Carl Lynch's lawyer, was that this testimony would enable the Government to withdraw a stipulation it had entered with Lynch whereby the Government agreed not to elicit the details of some sordid sexual misconduct between Carl Lynch and Michelle Hebron. Upon the Government's assurance that it did not intend to withdraw the stipulation because of Mr. Frisch's cross-examination, Mr. Bailey withdrew his objection. Tr. at 3161.
 
 
 [19]
 Carl Lynch joins this argument against the search of the home he shared with his wife, Myrtle Lynch. Brief of Carl Lynch at 33
 
 
 [20]
 Larman stated that these three persons were thus "speaking in violation of their penal interest." Government's Brief at 98 (app.) This court has held that a magistrate may infer from an admission against penal interest that an informant is reliable. United States v. Davis, 617 F.2d 677, 693 (D.C.Cir.1979). Although it is not entirely clear, it is likely that the two principal informants' statements were also admissions against their penal interests. This further supports their veracity
 
 
 [21]
 We have earlier stated that "(o)ur responsibility under the pertinent Supreme Court decisions is to give the affidavit a sensible, pragmatic reading, one that takes account of the pressure of time and the typical level of verbal skills in laymen police officers, and accords deference to the magistrate's determination, which may be based on demeanor evidence, to credit the affiant's assertions." United States v. Watts, 540 F.2d 1093, 1097 (D.C.Cir.1976)
 
 
 [22]
 United States v. Watts, 540 F.2d 1093, 1097 (D.C.Cir.1976)