UNITED STATES of America, Plaintiff-Appellee,

v.

Alphonso Galloway BURROUGHS, Clifton Weldon Rogers, a/k/a "Shotgun," a/k/a "Chief," Defendants-Appellants.

No. 86–3566.

United States Court of Appeals, Eleventh Circuit.

Nov. 3, 1987.

---

Daniel A. Smith, Jacksonville, Fla., for Burroughs.

Mark King Leban, Miami, Fla., for Rogers.

M. Alan Ceballos, Asst. U.S. Atty., Jacksonville, Fla., for U.S.

Before TJOFLAT and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

Clifton Weldon Rogers, Alphonso Galloway Burroughs, and Miles Jasper Rimes were indicted on April 9, 1986 in the Middle District of Florida. Count I charged them with conspiracy from early 1980 through January 1984 to possess heroin with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846. Counts II through VIII charged various combinations of the trio with possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. With one exception, the jury found the defendants guilty of all counts as charged.[1] The court sentenced Rogers to three 15 year terms to be served consecutively. Burroughs received two 15 year terms to be served consecutively to be followed by a special parole term of 10 years. The court sentenced Rimes to five concurrent five-year terms and a special parole term of five years. Rogers appeals, claiming that the evidence was insufficient to support and establish venue in the Middle District of Florida for all counts attributable to him. Burroughs appeals, and along with Rogers, challenges the district court's refusal to grant a mistrial and a new trial because of the government's failure to disclose to the defense information concerning a grant of immunity from prosecution given the wife of a government witness. Rimes does not appeal.[2]

For a number of years Rogers lived, worked, and sold heroin out of New York. Various couriers transported the drugs from Rogers' location to Jacksonville, Florida for Burroughs and his colleague, Bobby Roy Dennis.[3] The couriers testified as to numerous trips to New York beginning in 1980, with Dennis himself stating that he traveled on one occasion to purchase heroin from Rogers. At times, Burroughs permitted Dennis to acquire heroin from him on credit and to repay the debts from profits of the Jacksonville street sales. Dennis understood that Burroughs had a similar arrangement with Rogers. At other times, Burroughs and Dennis pooled their money in order to acquire heroin.

Prior to trial, Rogers and Burroughs filed motions for discovery. In particular, Rogers' motion requested:

The details of all threats, promises, assurances, understandings, or agreements, formal or informal, made by the prosecution, its representatives, or any other Government authority directly or indirectly to any witness or his counsel which could be considered by the witness as an inducement to cooperate with the Government. This request includes

---

1. The district court entered a judgment of acquittal in favor of Burroughs on one count after a witness refused to testify notwithstanding a grant of immunity.

2. Rimes filed a timely notice of appeal but subsequently asked that the appeal be dismissed.

3. At the time of trial, Dennis was serving a 35 year sentence for a 1984 conviction. Dennis testified for the government.

threats, promises, assurances, understandings or agreements made in connection with other cases or investigations.[4] The magistrate granted the request to the extent required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In response to the magistrate's order, the government told the defense that Dennis had been accepted in the prisoner protection program and that his wife had received $600 to enable her to visit him at the federal prison in Memphis, Tennessee.

Dennis testified against all three defendants at trial. During redirect examination, the following colloquy occurred:

MR. CEBALLOS (United States Attorney)

Q. What was the reason that you did decide to become a witness?

MR. DENNIS

A. The reason why I decided to become a witness is because my wife had got into some trouble and she came down here and I felt like the government gave her a fair shake.

Q. She got in some trouble with the Federal authorities?

A. Yes.

Q. Did you feel like you were testifying to keep your wife from getting in trouble?

A. No, because whatever, she had already gotten the break she was going to get. It was all over at the time but actually she was the one that talked me into it.

On recross-examination, Dennis was asked about the nature of his wife's troubles with the government. After he refused to answer, the government proffered at a sidebar conference evidence that Mrs. Dennis had testified falsely before a grand jury investigating an unrelated narcotics dealing and that the government had agreed not to prosecute her. The defense moved for a mistrial, arguing that the immunity deal for Dennis' wife was an inducement for Dennis to testify within the scope of *Brady*. The district court disagreed with

the characterization of the information as *Brady* material and denied the motion. The court, however, offered to "accept [requests] from counsel" for more time to gather information concerning Mrs. Dennis' deal. Instead of accepting the court's invitation, the defense continued the questioning of Dennis, asking him about the grant of immunity to his wife.

After testifying, Dennis was returned to his jail cell. The next day he purportedly wrote a letter to Burroughs' sister apologizing for testifying against Burroughs. In the letter Dennis wrote:

I didn't want to testify against [Burroughs].... [But m]y wife got in trouble ... and she was going to go to the penitentiary and they were going to take my kids and put them in a home.... I couldn't let her go to jail if there [was any way] that I could prevent it.

## DISCUSSION

### 1. *Brady Violation*

Appellants Rogers and Burroughs claim that the government withheld two material pieces of information: the "fair shake" (immunity from prosecution) given to Dennis' wife in the separate investigation, and the "threat" of government officials "to take [Dennis'] kids and put them in a [state] home." They contend that this information constituted "agreements" and "threats" used to induce Dennis to cooperate with the government as demanded in the discovery request, and that the information was material and favorable to the defense under *Brady v. Maryland, supra.*

 *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. To establish a *Brady* violation a defendant must show (1) that the prosecution suppressed evidence, (2) that the evidence suppressed was favorable to the defendant or exculpatory, and (3) that the evidence sup-

---

**4.** Burroughs filed a similar request.

pressed was material to the issues at trial. *United States v. Severdija,* 790 F.2d 1556, 1558 (11th Cir.1986). "Materiality" requires a finding that, had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. A "reasonable probability" is one "sufficient to undermine confidence" in the result. *See id.* (construing *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court considered the non-disclosure of evidence affecting credibility. It noted:

> When the "reliability of a given witness may well be determinative of guilt or innocence," non-disclosure of evidence affecting credibility falls within this general rule. We do not, however, automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict...." A finding of materiality of the evidence is required under *Brady.* A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury...."

> ....

> Here, the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.

*Id.* at 154–55, 92 S.Ct. at 766 (citations omitted).

Appellants seek to apply *Giglio* here by arguing that Dennis was the government's star witness. Because of Dennis' importance to the prosecution's case, his credibility was the "critical issue before the jury at trial." According to appellants, both pieces

of withheld information affected that credibility: the "fair shake" given his wife constituted his primary motivation for testifying for the government, and the information contained in the letter (that the government had "threatened" to take his children away from his wife) contradicted that assertion. Under *Giglio,* appellants argue, the jury was entitled to know of the information.

The government responds by considering separately the two pieces of evidence. It argues that the "fair shake" information *was* heard by the jury, foreclosing any speculation regarding the effect of the earlier non-disclosure on the verdict. The government also asserts that the information was not material under *Brady.* With respect to the "threat" evidence, the government likewise argues that the information was not material to the issues. For the following reasons, we agree with the government's contentions.

a. *The "Fair Shake"*

■ The purpose of *Giglio* and its progeny is "to insure that the jury knows the facts that might motivate a witness in giving testimony." *Brown v. Wainwright,* 785 F.2d 1457, 1465 (11th Cir.1986) (quoting *Smith v. Kemp,* 715 F.2d 1459, 1467 (11th Cir.), *cert. denied,* 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983)). In *United States v. Bruner,* 657 F.2d 1278 (D.C.Cir. 1981), the court encountered a situation similar to the one here. In *Bruner,* the United States Attorney's office failed to tell the defense about the indictment of a government witness and the subsequent dismissal of the indictment. Before completing the trial, the defense learned of the indictment and recalled the government witness to the stand. *See id.* at 1287. The D.C. Circuit held that no *Brady* violation had occurred: "The short answer to [defendant's] *Brady* argument is that [defendant's] lawyer learned of the evidence allegedly withheld and was given an opportunity to present that evidence in the only way it held any value for his client, by cross-ex-

amining the witness and attempting to impeach her." *Id.* at 1288. Because the withheld evidence was presented to the jury, no error was made. *Id.*

As in *Bruner*, the jury here learned of this impeaching information. After the government elicited the existence of the "fair" treatment given Dennis' wife, appellants had an opportunity to cross-examine Dennis about the deal. In fact, appellants actually did so, declining the district court's offer to hear motions for more time. The jury therefore actually learned the primary motivation behind Dennis' testimony. This is all that *Giglio* requires. Thus, the initial failure of the government to disclose the treatment given Dennis' wife did not constitute a *Brady* violation.

Alternatively, we cannot consider the information "material" to the determination of appellants' guilt.[5] Materiality is a function of the strength of the government's case. *See, e.g., United States v. Noe*, 821 F.2d 604, 607 (11th Cir., 1987). Regardless of the strength of the prosecution's case, however, nondisclosure may not be used to conduct a "trial by ambush." If the defense strategy is undermined by the failure to disclose, a new trial may be warranted. *See id.* at 607–08.

In *Giglio*, the weakness of the government's case played an important role in the Supreme Court's decision. As the Court noted, but for the improperly unchallengeable testimony of the witness against the defendant, "there could have been no indictment and no evidence to carry the case to the jury." *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766. That was not the case here. Granted, Dennis' testimony facilitated the convictions. However, multiple witnesses described a continuing heroin connection between Rogers in New York and Burroughs and others in Jacksonville. We cannot say that, had the information about Dennis' wife been disclosed earlier, a reasonable probability exists that the evidence could have been used by appellants to obtain their acquittal. Nor can we say that appellants were subjected to trial by ambush. This is particularly true here where the trial court offered to hear requests for more time to counter any possible effects of the non-disclosure. The court therefore did not err in denying the motions for a mistrial and a new trial based on this initially undisclosed evidence.

### b. The "Threat"

■ Appellants' contention concerning undisclosed threats comes from their reading of Dennis' letter to Burroughs' sister. In the letter, Dennis states that he did not want to testify but could not let his wife go to jail and their children be placed in a state home if he could prevent it. From this appellants infer that the government made an "affirmative threat" to take Dennis' children away from his wife.

Preliminarily, we cannot agree that the letter necessarily supports the conclusion that the government affirmatively threatened to remove Dennis' children from their home. Taking the letter at face value, however, it does imply that Dennis feared that his testimony might be needed to secure immunity from prosecution for his wife. This inference, of course, is at odds with Dennis' testimony that his wife's immunity was independent of his decision to testify for the government.

There is no indication that the government had any advance knowledge of Dennis' purported belief.[6] Even assuming it

---

5. At oral argument, the government also questioned whether the information would be "favorable" to the defense at all. According to the government, the jury would look favorably upon the prosecution for treating Dennis' wife so "fairly." This argument ignores the fact that the defense could use the information to challenge Dennis' motivation for testifying. In any event, we assume for purposes of this discussion that the first two prongs of *Brady* have been met, *i.e.*, that (1) the prosecution suppressed evidence and (2) that the evidence suppressed was favorable to the defendants.

6. We have difficulty understanding how the government could make available to the defense subjective information existing only in the mind of a witness, if that indeed was the case here.

did, however, this information is no more material under *Brady* than the evidence of the "fair shake" discussed above. Again, this evidence had impeachment value—the information tends to contradict the "fair shake" evidence, itself used for impeachment. However, numerous witnesses corroborated much of Dennis' testimony. In addition, Dennis was impeached through other means as well. The jury heard testimony that Dennis' wife had recently had trouble with the government and that the government had paid for her to visit him in jail. The parties elicited testimony that Dennis was resident in a federal prison, sentenced to over 30 years without parole for conducting a continuing criminal enterprise. We cannot say that any reasonable probability exists that this additional information about Dennis' purported belief would have resulted in a different outcome.

## 2. *Venue*

Appellant Rogers challenges venue in the Middle District of Florida for the substantive counts of possession with intent to distribute. Specifically, Rogers contends that each time he sold heroin it was for cash and the deal was completed in New York. Rogers therefore states that he had no interest in the heroin once he received the cash payments. Rogers also notes that he never traveled to any point in the Middle District of Florida. The government, in rebuttal, argues that Rogers indeed had a stake in the ultimate sale of the heroin in Jacksonville. Not until then would he receive payment for some of the sales. Because the substantive offenses were therefore continued in the Middle District of Florida, venue there was proper. We agree with the government.

■ The government concedes that proving venue is an essential part of its case. Criminal defendants have a constitutional and statutory right to be tried in the state and district in which the crime was committed. *United States v. Brunty*, 701 F.2d 1375, 1380 (11th Cir.), *cert. denied*, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143

(1983). "In reviewing an improper venue claim, this court must determine 'whether, viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in favor of the jury verdict ... the Government proved by a preponderance of the evidence' that the offense took place within the trial district." *United States v. Brantley*, 733 F.2d 1429, 1433 (11th Cir. 1984) (quoting *United States v. White*, 611 F.2d 531, 535 (5th Cir.), *cert. denied*, 446 U.S. 992, 100 S.Ct. 2978, 64 L.Ed.2d 849 (1980)), *cert. denied*, 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985). For the offense to have taken place within the trial district, it must have been begun, continued, or completed there. *See* 18 U.S.C. § 3237(a).

■ Viewing the evidence most favorably to the government, it authorizes the conclusion that Rogers had a continuing interest in the Jacksonville street sales. Testimony indicated that Rogers sometimes "fronted" the heroin to the purchasers. Fronting amounts to a credit sale where the debt is repaid through street sale profits. Thus, Rogers had a financial stake in the ultimate sale of the heroin in Jacksonville.

In *United States v. Brunty, supra*, the court encountered a similar venue challenge. In *Brunty*, the actual physical transfer of the drugs occurred in the Southern District of Florida. The defendant, however, was not to receive payment until his return to the Middle District of Florida. *See id.* at 1380. The court noted that "[b]ecause the evidence shows that [the defendant] expected payment upon his return to [the Middle District], it was proper for the jury to view [the defendant's] offense as continuing into the Middle District of Florida." *Id.* at 1382 (footnote omitted). The defendant was deemed to have retained constructive possession of the drugs until he received payment. *See id.* Such is the case here. Rogers relinquished physical possession of the heroin in New York. However, as noted above, the

evidence authorized a finding that he would not always receive payment until the drugs were sold in Jacksonville. Hence, the jury's finding that Rogers maintained constructive possession throughout the interim period was fully authorized. Because his possession offense "continued" in the Middle District of Florida, venue lay there.

### 3. *Sufficiency of the Evidence*

Appellant Rogers begins by challenging the sufficiency of the evidence linking him to any conspiracy. He asserts that the evidence did not show his specific intent to join the conspiracy. Rather, Rogers calls himself merely a supplier of drugs to various buyers. His isolated sales to the Jacksonville couriers, without knowledge of or a stake in the ultimate distribution of the drugs, do not prove his knowing participation in a Jacksonville conspiracy. Were it otherwise, asserts Rogers, "the ultimate purchasers of [Rogers'] sales, wheresoever they may be located in the United States (or in the world for that matter), would also be co-conspirators with the defendant."

 We believe that Rogers has misperceived the state of the record. It is correct that the government must prove that a defendant voluntarily entered into an agreement to achieve an unlawful objective. *United States v. Pantoja-Soto,* 739 F.2d 1520, 1525 (11th Cir.1984), *cert. denied,* 470 U.S. 1008, 105 S.Ct. 1369, 84 L.Ed.2d 389 (1985). Where the buyer's purpose is merely to buy, the seller's purpose is merely to sell, and no prior or contemporaneous understanding exists between the two beyond the sales agreement, no conspiracy has been shown. No joint objective exists among the two, even though both are aware of the illegal nature of the goods. *See United States v. Ford,* 324 F.2d 950, 952 (7th Cir.1963); *see also United States v. Cook,* 461 F.2d 906, 910 n. 3 (5th Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 219 (1972).[7]

However, reasonable inferences from the evidence presented against Rogers authorized the jury to find that a joint objective between Rogers, Burroughs, and Rimes indeed existed. Viewing the facts in the light most favorable to the jury verdict, as this Court must do, *see United States v. Blasco,* 702 F.2d 1315, 1331 (11th Cir.), *cert. denied sub nom. Galvan v. United States,* 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983), we see proof of much more than "mere isolated sales."

The evidence showed a continuing course of conduct by the defendants designed to result in the distribution of heroin in Jacksonville. From 1980–1984, employees of the enterprise regularly traveled from Jacksonville to New York to obtain heroin. The jury could find that Rogers knew from whence they came. One courier testified that she called Rogers before making her cross-country trips to New York and reported on his answering machine that she was departing from Jacksonville for his location. Each time she arrived Rogers was ready with the heroin, authorizing the conclusion that he had received her messages. Other testimony established Rogers' continued interest in the drugs up to and beyond their sale in Jacksonville. The evidence showed that Rogers sometimes "fronted" drugs to the Jacksonville buyers, requiring him to await the ultimate distribution of the drugs before he received payment. These were thus not isolated sales. Rogers worked with Burroughs, Rimes, and others to distribute heroin in Jacksonville. We find sufficient reason to sustain his conspiracy conviction.

 Finally, Rogers assails the sufficiency of the evidence for the substantive possession counts. His position clearly lacks merit, however. The government must connect a defendant with both aspects of the crime, possession *and* intent to distribute, to satisfy 21 U.S.C. § 841(a)(1). Alternatively, when a defendant is charged with aiding and abetting an offense under 18 U.S.C. § 2, the government must show that

---

7. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this Court adopted as precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981.

he assisted in perpetrating the crime while sharing in the requisite criminal intent. *See United States v. Martinez,* 555 F.2d 1269, 1271 (5th Cir.1977). From the foregoing discussion, it is clear that Rogers constructively possessed the heroin in Jacksonville. He intended for it to be distributed so that he could be certain of repayment on several occasions. Alternatively, Rogers assisted in the possession and distribution by fronting the drugs to others. Under either statute the evidence is sufficient to uphold the conviction.

The convictions of appellants BURROUGHS and ROGERS, therefore, are AFFIRMED.