[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 14, 2010
JOHN LEY
ACTING CLERK

_____

No. 08-16249
Non-Argument Calendar

_____

D. C. Docket No. 05-00257-CR-3-SLB-HGD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAUL TOPETE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(January 14, 2010)

Before CARNES, PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

Raul Topete appeals his convictions and 324 month total sentence for conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 846, and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

**I.**

In January 2004 the Houston Police Department intercepted a Federal Express package addressed to a house in Florence, Alabama containing approximately three kilograms of cocaine. The Houston Police Department notified the Drug Enforcement Administration. Agent Gasbarro, the DEA agent assigned to investigate the matter, planted a monitoring device in the package, removed the cocaine, replaced it with sugar, and then delivered the package to the house in Florence. The monitoring device failed, but the controlled delivery was a success. The DEA arrested the owner of the house and the person who signed for the package.

The intercepted cocaine was part of a large conspiracy to distribute marijuana and cocaine in North Alabama. In August 2005 a grand jury returned a superseding indictment charging Raul Topete and 20 co-defendants with conspiracy to possess with the intent to distribute cocaine and marijuana. According to the superseding indictment, the conspiracy began in January 1999

2

and continued through June 2005.  Topete, along with Connie Garth, was also charged with money laundering.

After a jury trial, Topete was convicted of both charges.  The district court sentenced him to concurrent prison terms of 324 months for the conspiracy conviction and 240 months for the money laundering conviction.  Topete now challenges his convictions and sentence.

## II.

Topete contends that the government failed to present sufficient evidence that he was a member of the conspiracy that was charged in the superseding indictment.  He argues that the evidence only established that he was in a buyer-seller relationship with Connie Garth.  He asserts that he had no knowledge of or interaction with the other members of the conspiracy.

"We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government."  United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005) (citation omitted).  We also make all reasonable inferences and credibility choices in favor of the government and the jury's verdict.  Id.  We must affirm "unless, under no reasonable construction of the evidence, could the jury have found the [defendant] guilty beyond a reasonable doubt."  Id.  "The evidence need not exclude every hypothesis of innocence or be completely

3

inconsistent with every conclusion other than guilt because a jury may select among constructions of the evidence." United States v. Bailey, 123 F.3d 1381, 1391 (11th Cir. 1997).

To obtain a conspiracy conviction under 21 U.S.C. § 846, "the government must prove that there is an agreement by two or more persons to violate the narcotics laws." United States v. Parrado, 911 F.2d 1567, 1570 (11th Cir. 1990). Thus, "the government must prove beyond a reasonable doubt that: (1) a conspiracy existed; (2) [the defendant] knew of the essential objectives of the conspiracy; and (3) [the defendant] knowingly and voluntarily participated in the conspiracy." United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997) ("Calderon I"), modified on other grounds by United States v. Toler, 144 F.3d 1423, 1427 (11th Cir. 1998). "[O]nce the government establishes the existence of the underlying conspiracy, it only needs to come forward with slight evidence to connect a particular defendant to the conspiracy." Id. (alteration omitted). The government does not need to prove that the defendant knew of all the details or participated in every aspect of the conspiracy, United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005), nor must it show that each conspirator was aware of his co-conspirators' existence or activities, United States v. Edouard, 485 F.3d 1324, 1347 (11th Cir. 2007). "While the existence of a simple buyer-seller relationship

4

alone does not furnish the requisite evidence of a conspiratorial agreement, an agreement to distribute drugs may be inferred when the evidence shows a continuing relationship that results in the repeated transfer of illegal drugs to a purchaser." United States v. Thompson, 422 F.3d 1285, 1292 (11th Cir. 2005) (quotations, citation, and alteration omitted).

Topete contends that the evidence introduced at trial only showed that he was in a buyer-seller relationship with Connie Garth. We disagree. The evidence showed more than "mere isolated sales" between Topete and Garth. See United States v. Burroughs, 830 F.2d 1574, 1581 (11th Cir. 1987); cf. (noting that "[w]here the buyer's purpose is merely to buy, the seller's purpose is merely to sell, and no prior or contemporaneous understanding exists between the two beyond the sales agreement, no conspiracy has been shown"); United States v. Mercer, 165 F.3d 1331, 1335 (11th Cir. 1999) (A buy-sell transaction is an "agreement to exchange drugs for money."). Garth testified that he purchased large quantities of marijuana and cocaine from Topete on multiple occasions over a period of several years. Garth also testified that Topete sold him the drugs on a "fronted" basis. See United States v. Torres, 53 F.3d 1129, 1133 n.1 (10th Cir. 1995) ("Fronting" refers to "when a seller of drugs gives the drugs to a buyer on credit with the understanding that when the buyer resells the drugs to the

5

customers, the proceeds of those sales are to be used to pay the supplier."). Thus, Topete had an interest in the drugs beyond their sale to Garth. He had to wait for Garth to distribute the drugs to receive payment. See Burroughs, 830 F.2d at 1581. Jason Moore also testified that Topete told him that he was "using Connie [Garth] in North Alabama to distribute the majority of the marijuana loads . . . that he was getting." Viewing the evidence in the light most favorable to the jury's verdict, a reasonable jury could have found that Topete conspired with Garth to distribute drugs in North Alabama. Although Topete contends otherwise, the government was not required to prove that he knew all the details of the conspiracy, see Miranda, 425 F.3d at 959, or all its members. See Edouard, 485 F.3d at 1347.

Topete also maintains that the government's evidence established that he was involved in conspiracies with Jason Moore and Garth distinct from the conspiracy charged in the superseding indictment. He contends that there was a material variance between the government's proof at trial and the conspiracy charged in the superseding indictment. "The standard of review for whether there is a material variance between the allegations in the indictment and the facts established at trial is twofold: first, whether a material variance did occur, and, second, whether the defendant suffered substantial prejudice as a result." United States v. Chastain, 198 F.3d 1338, 1349 (11th Cir. 1999).

"A material variance between an indictment and the government's proof at trial occurs if the government proves multiple conspiracies under an indictment alleging only a single conspiracy." United States v. Alred, 144 F.3d 1405, 1414 (11th Cir. 1998) (internal quotation marks omitted). Because it is the jury's function to determine whether the evidence establishes a single conspiracy, the conceivable existence of multiple conspiracies will not constitute a material variance if a reasonable trier of fact could have found the existence of a single conspiracy beyond a reasonable doubt. Id. "If a defendant's actions facilitated the endeavors of other co[-]conspirators or facilitated the venture as a whole, then a single conspiracy is shown." United States v. Chandler, 388 F.3d 796, 811 (quotation, alteration, and emphasis omitted).

In addition to his dealings with Garth, Topete also sold marijuana to Moore. Moore testified that he purchased marijuana from Topete on at least 10 occasions between 1998 and 2000. Moore was not one of the defendants charged in the superseding indictment. However, even if Moore's testimony established that Topete was involved in a conspiracy with Moore distinct from the conspiracy charged in the superseding indictment, Topete's separate conspiracy argument with respect to Garth is without merit. Garth testified that Topete sold him marijuana from 1999 to 2001 and cocaine from 2001 to 2004 on a fronted basis. He also

testified that he would sell the drugs to Topete's co-defendants and then pay Topete. Based on that testimony, a reasonable jury could have found that Topete was involved in a single conspiracy with Garth and the other individuals charged in the superseding indictment. See Calderon I, 127 F.3d at 1327. The common goal of the conspiracy was to distribute marijuana and cocaine in Alabama. See id. Topete, a supplier, distributed drugs to Garth who in turn distributed them to his co-defendants. The co-conspirators were dependent on each other. Topete, as a supplier, depended on Garth, as a middleman. Garth depended on his various buyers. See Chandler, 388 F.3d at 811 (noting that "to prove a single, unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies, the government must show an interdependence among the alleged co-conspirators"). Because a reasonable jury could have found that Topete was involved in a single conspiracy to distribute drugs, we affirm his conviction for conspiracy to possess with intent to distribute controlled substances.

**III.**

Topete also contends that the district court erred by denying his motion for judgment of acquittal on the promotional money laundering charge. He asserts that the evidence introduced at trial established that he fronted drugs to Garth and that the payments made by Garth to him were for those fronted drugs. Topete contends

8

that the payment of money by a drug dealer to a drug supplier for fronted drugs does not constitute money laundering within the meaning of 18 U.S.C. § 1956(a)(1)(A)(i).

> Section 1956(a)(1)(A)(i) provides:
>
> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both . . . .

18 U.S.C. § 1956(a)(1)(A)(i). To obtain a conviction under § 1956(a)(1)(A)(i) the government must prove beyond a reasonable doubt that:

> (1) the defendant conducted or attempted to conduct a financial transaction; (2) the defendant knew the property involved in the transaction represented the proceeds of unlawful activity; (3) the property involved was in fact the proceeds of the specified unlawful activity; and (4) the defendant conducted the financial transaction 'with the intent to promote the carrying on of [the] specified unlawful activity.'

United States v. Calderon, 169 F.3d 718, 721 (11th Cir. 1999) ("Calderon II") (citing 18 U.S.C. § 1956(a)(1)(A)(i)). The "gravamen" of a § 1956(a)(1)(A)(i) violation is the fourth element: that the defendant conducted the financial transaction with the intent to promote the carrying on of the specified unlawful activity. See United States v. Caricone, 272 F.3d 1297, 1303 (11th Cir. 2001).

9

Topete contends that a drug dealer's payment of money to a drug supplier for fronted drugs does not satisfy § 1956(a)(1)(A)(i)'s promotion requirement.

We have not addressed whether the payment of money for fronted drugs satisfies the promotion requirement of § 1956(a)(1)(A)(i). Other court of appeals addressing this issue have reached conflicting conclusions. Compare United States v. King, 169 F.3d 1035, 1039 (6th Cir. 1999) (affirming conviction based on evidence that defendant wired money more than once to drug couriers in payment for fronted drugs and stating that "[p]ayment for drugs may constitute 'promotion' for the purposes of [§ 1956(a)(1)(A)(i)] when such payment encourages further drug transactions."); United States v. Baker, 63 F.3d 1478, 1494 (9th Cir. 1995) (affirming conviction based on evidence that the defendant made payments to suppliers of contraband cigarettes, reasoning that the payments promoted his illegal trafficking because the trafficking could not have continued without them); United States v. Skinner, 946 F.2d 176, 177–78 (2d Cir. 1991) (affirming drug dealer and drug supplier's money laundering conviction based on evidence that drug dealer made payments to drug supplier for fronted drugs); United States v. Thorn, 317 F.3d 107, 132 (2d Cir. 2003) (noting that § 1956(a)(1)(A)(i) covered the conduct in Skinner "even though any promotion of the drug trafficking was de minimis, because the transactions in reality represented only the completion of the sale.")

10

(internal quotation marks omitted); with United States v. Dovalina, 262 F.3d 472, 475–76 (5th Cir. 2001) (rejecting the government's argument that a fronting arrangement between a drug supplier and drug dealer itself constituted promotion money laundering because if the drug dealer did not pay the drug supplier, the drug dealer would stop receiving drug shipments); United States v. Heaps, 39 F.3d 479, 485 (4th Cir. 1994) (reversing a conviction for money laundering and noting that "[w]ere the payment for drugs itself held to be a transaction that promoted the unlawful activity of that same transaction virtually every sale of drugs would be an automatic money laundering violation as soon as money changed hands"), abrogated on other grounds by United States v. Cabrales, 524 U.S. 1, 5–6, 118 S. Ct. 1772, 1775–76 (1998), as recognized in United States v. Villarini, 238 F.3d 530, 534–35 (4th Cir. 2001).

We do not need to decide whether the fronting of drugs to a buyer by a seller constitutes promotion money laundering under § 1956(a)(1)(A)(i). The evidence introduced at trial established more than that Topete gave drugs to Garth and that Garth paid for the drugs after selling them. Garth testified that he paid Topete money every month in 2002 for fronted drugs. He also testified that Topete told him, "when you get a certain amount [of money], you just get it onto me, and I can just go on and send off for some more [drugs]." Thus, the government introduced

11

evidence establishing that Topete used the payments from Garth to buy more drugs. That evidence was sufficient proof of promotion money laundering. Cf. Dovalina, 262 F.3d at 476 (noting that the government failed to present evidence establishing that the drug supplier used the drug dealer's payments to buy more marijuana and stating that "the [g]overment was required to prove that [the drug supplier] used at least part of the proceeds in a subsequent financial transaction with the intent to promote unlawful activity"); Heaps, 39 F.3d at 486 (observing that the evidence only showed that the defendant put the money he received for the fronted drugs in a box in his house and stating that "[t]here was no evidence that the money acquired through the payment was itself used to promote an unlawful activity"); see Torres, 53 F.3d at 1137 n.6 (testimony that defendant used the proceeds of the wire transfer to buy more drugs that would later be resold satisfied the promotion element of § 1956(a)(1)(A)(i)). Viewing the evidence in the light most favorable to the jury verdict, we conclude that the jury could have found beyond a reasonable doubt that Topete used the proceeds of the transactions with Garth to promote additional drug sales. Accordingly, we affirm his money laundering conviction.

## IV.

Topete also challenges the district court's jury instruction regarding multiple

12

conspiracies. He contends that the district court's jury instruction on multiple conspiracies mischaracterized the law, misled the jury, and did not adequately inform the jury that "if they found multiple conspiracies separate and distinct from the conspiracy charged in the indictment, then they would have to determine which conspiracy [Topete] was involved with and acquit him if it was not the one charged in Count [1]."

"We review the district court's refusal to give a defendant's requested jury instructions for an abuse of discretion." United States v. Schlei, 122 F.3d 944, 969 (11th Cir. 1997). "We will find reversible error only if (1) the requested jury instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." United States v. Richardson, 532 F.3d 1279, 1289 (11th Cir. 2008) (internal quotation marks omitted). We review de novo whether the district court's jury instruction mischaracterized the law or misled the jury to the prejudice of the defendant. United States v. Gray, 367 F.3d 1263, 1271 (11th Cir. 2004).

The district court's jury instruction regarding multiple conspiracies was proper. It was identical to the Eleventh Circuit Pattern Jury Instruction. See Eleventh Circuit Pattern Jury Instructions (Criminal) 13.3; Richardson, 532 F.3d at

13

1290 (quoting the Eleventh Circuit Pattern Jury Instruction for multiple conspiracies). The instruction given by the district court was an accurate statement of the law and adequately informed the jury that Topete could only be convicted if he was a member of the conspiracy charged in the superseding indictment. Accordingly, no error occurred.

## V.

Finally, Topete contends that his 324-month total sentence was unreasonable. "We review sentencing decisions only for abuse of discretion, and we use a two-step process." United States v. Shaw, 560 F.3d 1230, 1237 (11th Cir. 2009). First, we must " 'ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.' " Id. (quoting Gall v. United States, 552 U.S. 38, __, 128 S. Ct. 586, 597 (2007)). If we find the sentence to be procedurally sound, the second step is to review the "substantive reasonableness" of the sentence, taking into account the totality of the circumstances, "including the extent of any variance from the Guidelines range." Gall, 552 U.S. at __, 128 S. Ct.

14

at 597. If the district court's sentence is within the guidelines range, we expect that the sentence is reasonable. See United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) ("After Booker, our ordinary expectation [of reasonableness] still has to be measured against the record, and the party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both that record and the factors in section 3553(a)."); see also United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008) ("Although we do not automatically presume a sentence within the guidelines range is reasonable, we 'ordinarily . . . expect a sentence within the Guidelines range to be reasonable.'" (quoting Talley, 431 F.3d at 788)).

When deciding upon a sentence, the district court must evaluate all of the § 3553(a) factors, Gall, 552 U.S. at __, 128 S. Ct. at 596, but it is allowed to attach "great weight" to one factor over others. Id. at 600; Shaw, 560 F.3d at 1237. In evaluating the factors, the district court is "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall, 552 U.S. at __, 128 S. Ct. at 598 (internal quotation marks omitted). We give the district court's sentencing decision "due deference," id. at __, 128 S. Ct. at 597, because "[t]he sentencing judge is in a superior position to find facts and judge

15

their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insight not conveyed by the record." Id. (internal quotation marks omitted). Moreover, district courts have an "institutional advantage" in making sentencing determinations because "they see so many more Guidelines sentences than appellate courts do." Id. at __, 128 S. Ct. at 598 (internal quotation marks omitted).

The first review is for procedural error in the sentencing. See Shaw, 560 F.3d at 1237. Topete does not contend that the district court incorrectly calculated the sentencing guidelines or treated them as mandatory. Instead, he argues that the district court failed to consider all the § 3553(a) factors and instead erroneously focused only on §3553(a)(2), which includes the need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. We disagree. The district court discussed several of the § 3553(a) factors on the record and expressly acknowledged considering them when imposing its sentence. That acknowledgment "alone is sufficient in post-Booker sentences." United States v. Scott, 426 F.3d 1324, 1330 (11th Cir. 2005).

Topete also asserts that a procedural error occurred because the district court

did not adequately explain its sentence. Given that Topete had no prior criminal history, he contends that the district court was required to offer compelling reasons for sentencing him to a term of imprisonment of 324 months, a sentence at the low-end of the advisory guidelines range.[1] Topete's argument is without merit. The district court explained that it was imposing a sentence within the advisory guidelines range because of the large quantity of drugs that he had been supplying. Agent Gasbarro, a DEA agent with over two decades of experience, testified that Topete was one of the three largest drug suppliers that he had ever investigated. The district court used Agent Gasbarro's testimony as a reference point for understanding the quantity of drugs Topete had been supplying and explained that a 324 month sentence was reasonable in light of that large volume. The district court also explained that it was sentencing Topete at the low end of the advisory guidelines range because of his lack of prior criminal history. The district court's explanation was sufficient and no procedural error occurred. See United States v.

---

[1]Topete was convicted of conspiracy to distribute and possess with intent to distribute controlled substances (count 1) and money laundering (count 8). Under the sentencing guidelines, those offenses are grouped for purposes of determining a defendant's advisory guidelines range. Based on the quantity of drugs attributed to him, Topete's base offense level was 38. He received a 3 point increase because he was a manager or supervisor, resulting in a total offense level of 41. Because he had no prior criminal history, he was placed in a criminal history category of I. With a total offense level of 41 and a criminal history category of I, Topete's advisory guidelines range was 324 to 405 months. He was sentenced to 324 months imprisonment for the conspiracy conviction and 240 months for the money laundering conviction, the sentences to be served concurrently.

17

Bonilla, 463 F.3d 1176, 1182 (11th Cir. 2006) (noting that Booker and our prior precedent do not require a district court "to articulate its consideration of each individual § 3553(a) factor" when explaining its sentence).

Because Topete's sentence was "procedurally sound," Shaw, 560 F.3d at 1237, we next review the substantive reasonableness of his sentence. He contends that his sentence is substantively unreasonable because the district court gave too much weight to Agent Gasbarro's testimony that Topete was one of the three largest drug suppliers that Gasbarro had ever investigated. Gasbarro's testimony concerning the quantity of drugs Topete was supplying involved the "the nature and circumstances of the offense." See § 3553(a)(1). The fact that the district court attached a great deal of weight to Gasbarro's testimony does not mean that the sentence, which was at the low end of the guidelines range, was unreasonable. See United States v. Williams, 526 F.3d 1312, 1322 (11th Cir. 2008) ("A district court's unjustified reliance on a single § 3553(a) factor may be a 'symptom' of an unreasonable sentence. However, such a sentence is not necessarily unreasonable.") (internal citations omitted). "Indeed, the weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." Id. (internal quotation marks and alteration omitted).

It is clear from the sentencing transcript that the district court considered

18

other § 3553(a) factors and took great care to select a sentence that was reasonable. The district court stressed that it was trying to determine what constituted a reasonable sentence in Topete's case, stating "I'm trying to find what is a reasonable sentence." After listening to the parties' arguments, speaking with a probation officer, and listening to Agent Gasbarro's testimony, the district court concluded that a 324 month sentence was reasonable. In light of the large volume of drugs involved, we cannot say the district court's decision to sentence Topete at the lowest end of the advisory guidelines range was unreasonable.

**AFFIRMED.**